1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD BERMAN, | Case No. 1:13-cv-00597-SAB |
| Plaintiff, | ORDER GRANTING IN PART DEFENDANT FRESNO COUNTY'S |
| v. | MOTION FOR SUMMARY JUDGMENT AS TO THE FIFTH CLAIM REGARDING 4TH |
| COUNTY OF FRESNO and TRACY SINK, | AMENDMENT VIOLATIONS ONLY |
| Defendants. | _____ |
| | (ECF No. 67) |

Currently before the Court is Defendant Fresno County's ("Fresno County") motion for partial summary judgment with regard to Plaintiff Richard Berman's ("Plaintiff" or "Berman") fifth claim for relief for municipal liability against Fresno County. (ECF No. 67.)[1]

The hearing on County of Fresno's motion for partial summary judgment on the fifth cause of action in the complaint for municipal liability took place on April 8, 2016. Jacob Weisberg appeared on behalf of Plaintiff and Michelle Sassano and James Arendt appeared on behalf of Fresno County. For the reasons set forth below, the Court grants in part Fresno County's motion for summary judgment on Plaintiff's fifth claim for relief for municipal liability regarding excessive force and unlawful arrest claims in violation of the Fourth Amendment.

## I.

## BACKGROUND

Plaintiff is a criminal defense attorney and characterizes himself as "a vigorous and

---

[1] The Court notes that all parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes. (ECF Nos. 18, 47.)

1  effective advocate who has repeatedly challenged law enforcement conduct."  Deputy Sink is

2  assigned to the Department's Court Services Division ("division") at the Fresno County Criminal

3  Courthouse ("courthouse").   Lt. Reynolds and Sgt. Bertsch are division supervisors.   The

4  complaint alleges 42 U.S.C. § 1983 ("section 1983") unlawful detention, excessive force,

5  retaliation, supervisory and Monell liability and related California claims against the County

6  defendants.

7       On March 13, 2012, Deputy Sink arrested Plaintiff after Plaintiff, his client and the

8  client's family member, Ms. Blunt, attempted to proceed through courthouse security screening.

9  Plaintiff alleges that as Plaintiff instructed Ms. Blunt to take a plastic wrench back to her car,

10 "Deputy Sink forcefully grabbed Berman and placed him under arrest" to injure Plaintiff's back,

11 neck, arm and stomach/groin area.  The complaint alleges that Plaintiff was retaliated against for

12 questioning Deputy Sink's authority and advocating Ms. Blunt's rights.  In his fifth claim for

13 relief, Plaintiff alleges municipal liability under 42 U.S.C. § 1983.

14      On February 29, 2016, Fresno County filed the instant motion for partial summary

15 judgment.  (ECF No. 67.)  On March 29, 2016, Plaintiff filed his opposition to the motion for

16 partial summary judgment.  (ECF No. 69.)[2]  On April 5, 2016, Fresno County filed a reply to

17 Plaintiff's opposition.

18                              **II.**

19                    **SUMMARY JUDGMENT STANDARD**

20      Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment ...

21 if the movant shows that there is no genuine dispute as to any material fact and the movant is

22 entitled to judgment as a matter of law."  Summary judgment must be entered "against a party

23 who fails to make a showing sufficient to establish the existence of an element essential to that

24 party's case..." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] party seeking summary

25 judgment always bears the initial responsibility of informing the district court of the basis for its

26 motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

27 

28 [2] On April 7, 2016, the Court granted Plaintiff's request to exceed the page limitations for the opposition to the motion for partial summary judgment.  (ECF No. 73.)

1  and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

2  absence of a genuine issue of material fact." Id.

3       If the moving party meets its initial responsibility, the burden then shifts to the opposing

4  party to establish that a genuine issue as to any material fact actually does exist.  Matsushita

5  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

6  existence of this factual dispute, the opposing party may not rely upon the denials of its

7  pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or

8  admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P.

9  56(e); Matsushita, 475 U.S. at 586 n.11.

10  **III.**

11  **UNDISPUTED FACTS[3]**

12       1.     Deputy Tracy attended a POST certified basic police academy at Fresno City

13  College.

14       2.     Deputy Sink was hired with the Fresno County Sheriff's Office in 2007.

15       3.     Deputy Sink has spent all but one year of service working for court services unit

16  in various positions.

17       4.     On March 13, 2012, Deputy Sink was assigned to the main courthouse lobby.

18       5.     On the date of the incident, Deputy Sink was working in the baggage search area.

19       6.     Deputy Sink was familiar with the Fresno County Sheriff Department's Policies

20  and Procedures for Use of Force on March 13, 2012.

21       7.     On March 13, 2012, Toshia Blunt put her purse on the conveyor belt to be

22  scanned.

23       8.     On March 13, 2012, a plastic wrench was located in Toshia Blunt's purse.[4]

24  

---

[3] Plaintiff moves to exclude numerous pieces of evidence and objects to undisputed facts presented by Fresno
25  County based on the grounds of relevance and hearsay.  (ECF Nos. 69-1, 69-6.)  Fresno County objects to numerous
undisputed facts by Plaintiff on the basis of relevance and hearsay.  (ECF No. 71-2.)  To the extent the Court
26  necessarily relied on evidence that has been objected to, the Court relied only on admissible evidence and, therefore,
the objections are OVERRULED.  It is not the practice of the Court to rule on evidentiary matters individually in the
27  context of summary judgment, unless otherwise noted.  This is particularly true when the evidentiary objections
consist of general objections such as relevance.  See Capital Records, LLC v. BlueBeat, Inc., 765 F.Supp.2d 1198,
28  1200 n.1 (C.D. Cal. 2010).

1      9.      Deputy Sink asked whose purse had the plastic wrench and it was Toshia's.

2      10.     Deputy Sink informed Toshia Blunt that the plastic wrench could not be brought

3  in and asked Toshia to take it out.

4      11.     Deputy Sink did not tell her to throw the plastic wrench away.

5      12.     Deputy Sink handed the plastic wrench to Toshia Blunt to take outside the

6  courthouse.

7      13.     Richard Berman walked over from the elevators to where Toshia Blunt and

8  Deputy Sink were located.

9      14.     Toshia Blunt handed the plastic wrench to Richard Berman.

10     15.     Richard Berman stated that the plastic wrench was only plastic.

11     16.     Deputy Sink tried to get the plastic wrench back from Richard Berman on more

12  than one occasion.

13     17.     Richard Berman did not give the plastic wrench back to Deputy Sink.

14     18.     Toshia Blunt remembers the Deputy telling Richard Berman that she was going to

15  handcuff him.

16     19      Nadia, Richard Berman's client and Toshia Blunt's sister, heard Deputy Sink say

17  she was going to arrest Richard Berman.

18     20.     After Richard Berman was handcuffed, he was placed in a chair in the lobby.

19     21.     At the time of the incident that is the subject of this lawsuit, it was the policy of

20  the Fresno Sheriff's Department to comply with the minimum training requirements for peace

21  officers in the State of California as mandated by POST.

22     22.     POST is recognized as the authority that governs the training of peace officers in

23  California.

24     23.     Deputy sheriffs employed by Fresno Sheriff's Department are required to attend

25  POST certified academy.

26  _____

27  [4] Plaintiff objects to Fresno County's description of the wrench as a hard plastic adjustable wrench.  Plaintiff wants
the undisputed fact to refer to that item as a plastic toy wrench.  The Court notes that whether the item is a toy
wrench or a hard plastic adjustable wrench is immaterial to the instant motion for summary judgment.  The parties

28  do not dispute that the wrench was a plastic wrench and the Court will refer to it as a plastic wrench.

24. Additionally, deputies receiving ongoing training in compliance with POST standards.

25. Deputies receive training consistent with policies and legal standards concerning use of force and arrest.

26. In 2007, when Deputy Sink was initially hired, deputies underwent a 14 to 16 week field training program.

27. The new deputies were placed with three different experienced training officers during this program.

28. Deputies were instructed on a number of topics, including, but not limited to the policies and procedures of the Fresno Sheriff's Department and relevant standards concerning use of force and arrest, and report writing.

29. Deputies were evaluated on a daily basis during the field training program.

30. Fresno County deputy sheriffs also receive on-the-job training, and attend advanced officer courses, and various classes and seminars offered throughout California.

31. The Sheriff's Department has a training unit that ensures deputy sheriffs receive training in compliance with POST.

32. At the time of this incident, Fresno Sheriff's Department met or exceeded POST minimum training requirements.

33. It is the practice of Fresno Sheriff's Department that if a particular training need for a specific deputy is identified, the training will be provided.

34. At the time of the incident, Deputy Tracy Sink was in compliance with POST and Fresno County Sheriff's Department training requirements.

35. At the time of the incident, Lt. Mark Padilla was the court security unit commander.

36. At the time of the incident, Fresno County deputy sheriffs in the court security unit were supervised through a chain of command: sergeant, lieutenant, assistant sheriff and sheriff.

37. Deputies were supervised on a daily basis by sergeants, their immediate

1    supervisors, and/or senior deputies.

2         38.    Deputies were expected to comply with Fresno Sheriff's Department policies,

3    practices, procedures, and training requirements, and were subject to disciplinary actions if they

4    failed to do so.

5         39.    At no time has the Fresno Sheriff's Department had a policy, practice, or custom

6    of improperly supervising its deputy sheriffs.

7         40.    At the time of the subject incident, and at all times as alleged by the plaintiffs, it

8    was the policy of the Fresno Sheriff's Department to conduct annual performance evaluations of

9    deputy sheriffs.

10        41.    Evaluations were prepared by a deputy's immediate supervisor.

11        42.    The evaluation considers the quantity and quality of work, responsiveness,

12    compliance with rules, regulations and procedures, interpersonal skills, technical skills,

13    professional skills, attendance, and productivity.

14        43.    The supervisor preparing the evaluation may speak to the deputy's peers and other

15    supervisors the deputy may have had.

16        44.    Supervisors preparing performance evaluations review a deputy's personnel and

17    bureau files to determine if they received any disciplinary actions during the rating period, and/or

18    commendations for work performance.

19        45.    After the evaluation is prepared, the sergeant who prepared it will review the

20    evaluation with the subject deputy.

21        46.    Evaluations note both positive and negative traits of the particular deputy sheriff

22    being reviewed.

23        47.    The evaluation could also identify any training needs of a deputy that were

24    perceived necessary.

25        48.    The evaluations are maintained in a deputy's personnel file.

26        49.    A bureau file is also maintained for individual deputy sheriffs.

27        50.    A bureau file is considered a working file and follows a deputy to each

28    bureau/unit they are assigned.

51.     One purpose of the bureau file is to maintain documents to be reviewed by a deputy's supervisor when preparing the yearly evaluation and to note particular training needs.

52.     All deputy sheriffs received training with respect to these issues and compliance with Fresno Sheriff's Department policy in this regard.

53.     At the time of the incident, and at all prior times, it was the policy of the Fresno County Sheriff's Department that no member shall act or behave in such a manner that would bring the discredit or ridicule upon themselves or the department.

54.     It is also the policy that members shall be respectful, courteous and civil with all members of the public and shall not use profane or insolent language toward any person.

55.     At the time of the subject incident, and at all times as alleged by plaintiffs, it has been the policy and practice of the Fresno Sheriff's Department to conduct thorough investigations into allegations of misconduct on the part of its personnel.

56.     An administrative investigation into allegations of misconduct may be initiated by a citizen through the presentation of a citizen complaint to the Fresno Sherriff's Department, or initiated internally by members of the Fresno Sheriff's Department.

57.     Sheriff's Department personnel are put on notice, in writing, if they are the subject of an Internal Affairs investigation.

58.     Once it is determined that a complaint will result in an investigation, it will be assigned either to an Internal Affairs investigator, or returned to the bureau of the deputy that is the subject of the complaint to conduct the investigation.

59.     The investigator will conduct interviews and obtain relevant documents.

60.     The investigator generally will also determine if there have been similar complaints against the involved deputy.

61.     After the investigation is completed, the investigator will prepare a summary investigative package.

62.     The investigative package will then go to the commander of the unit where the involved deputy works.

63.     The unit commander will then review the investigation and make a

1   recommendation whether discipline should be imposed, and/or whether additional training or

2   other corrective action be taken.

3         64.   The investigation and recommendation will then go to the Sheriff's Department

4   Professional Standards Review Board ("PSRB") for an independent review.

5         65.   The PSRB meets and jointly reviews the investigation and also recommends

6   whether policy was violated, and if so, discipline that should be imposed.

7         66.   After the PSRB review, the investigation goes through the same process with the

8   Undersheriff.

9         67.   After the Undersheriff's review, the investigation goes to the Sheriff for review

10  and a final disposition.

11        68.   With respect to the internal investigation related to the incident that is the subject

12  of this lawsuit, the above-described procedures were followed.

13        69.   If a disciplinary measure is imposed, documentation reflecting that determination

14  will be placed in the involved deputy's personnel file.

15        79.   If discipline is not imposed, the completed Internal Affairs investigation is

16  maintained in the Internal Affairs Unit office.

17        71.   These records may be reviewed upon request by supervisors of Sheriff's

18  Department personnel.

19        72.   At all times relevant to this action, it was the policy of the Fresno Sheriff's

20  Department to take sufficient corrective action to prevent its employees from committing

21  misconduct, including constitutional violations or any violation of state or federal law.

22        73.   Sgt. Bertsch was one of Deputy Sink's supervisors at the time of the incident.

23        74.   Sgt. Bertsch was on duty the day of the incident and called to the lobby.

24        75.   After the incident, Sgt. Bertsch investigated the incident by speaking with Deputy

25  Herman, Deputy Sink and watching the video and determined probable cause for the arrest.

26        76.   Deputy Sink only had less than five verbal complaints of being rude between May

27  2001 and the incident.

28        77.   The complaints generally consisted of a people being refused entry of an item into

the courthouse and complaining that Deputy Sink was rude.

78.     No one ever complained that Deputy Sink used foul language.[5]

79.     The courthouse receives between an estimated 1,000-3,000 people per day, so Sgt. Bertsch did not feel 4 verbal complaints were a problem in a 10 month period.

80.     Sgt. Bertsch spoke with Deputy Sink each time someone stated she was rude.

81.     Sgt. Bertsch would have written Deputy Sink up if there was ever a complaint of foul language.[6]

82.     Sgt. Bertsch, during the timeframe of this incident, prepared Deputy Sink's evaluations.

83.     In December 2012, a citizen complaint was filed that Deputy Sink was rude.

84.     An IA investigation was conducted into the complaint.

85.     All the proper procedures were followed for the IA investigation.

86.     The determination of the IA investigation was not sustained.

87.     Plaintiff Richard P. Berman is an attorney at law who has practiced law in Fresno County from 1973 to February 2016, when he became an inactive member of the State Bar Association.  He is the former President of the Fresno County Bar Association.  He is a former Chief Deputy District Attorney of Fresno County; he was in the United States Army Reserve from 1968 to 1980 and attained the rank of Captain; and was an active participant in civic and charitable organizations.  He was 65 years old at the time of the incident.  He has no criminal

---

[5] Fresno County stated that it is undisputed that no one ever complained that Deputy Sink used foul or inappropriate language.  Plaintiff concedes that there are no records that anyone complained that Deputy Sink used foul language, and therefore this is an undisputed fact.  Plaintiff argues that there were complaints that Deputy Sink used inappropriate language, because there were complaints that she was rude and rude language is inappropriate language.

[6] Plaintiff objects to this fact, citing Rule 401 of the Federal Rules of Evidence, because he alleges that it calls for speculation as to what would have happened if there had been a complaint of foul language.  Rule 401 of the Federal Rules of Evidence sets forth the test for relevant evidence as follows:

> Evidence is relevant if:
> **(a)**  it has any tendency to make a fact more or less probable than it would be without the evidence; and
> **(b)**  the fact is of consequence in determining the action.

The Court only considers evidence that is relevant in determining the motion for summary judgment, so any evidence that is not relevant is not considered.

record either before the incident or afterwards.

88.     On March 13, 2012, Mr. Berman entered the Fresno County Superior Courthouse on Van Ness Avenue to handle a proceeding for his client, Nadia Diaz.  Her sister, Toshia Blunt, came with her as a support person.

89.     Mr. Berman entered the courthouse lobby going through security.  Ms. Diaz entered the courthouse through security.  Toshia Blunt was stopped by Deputy Sink when she came through the main courthouse security because her 3 ½ year old son had left a plastic wrench in her purse.  Deputy Sink took the plastic wrench and told Toshia Blunt that she needed to take the plastic wrench out of the courthouse.

90.     It was the opinion of Sergeant Lopez, a supervisor of Deputy Sink when she was assigned to courthouse security, that, when shown a facsimile of the toy wrench, that there was no problem with this particular toy being brought into the courthouse.

91.     Sergeant Lopez stated that if someone just comes in with this [toy] "That's my kid's; I look at it, I handle it.  I make a determination and use the discretion I'm afforded.  'Come on in.'"

92.     Mr. Berman, who was waiting at the elevator for Ms. Blunt so that the three of them could go up to the courtroom, noticed the delay and walked back to find out why.  Ms. Blunt told Mr. Berman that she was not being allowed to bring the plastic wrench into the courthouse.  Mr. Berman asked her what the problem was.  She held up the plastic wrench and said "This is my son's.  I put it in my purse when he got out to go to school."

93.     At the same time Ms. Blunt was conversing with Mr. Berman, Deputy Sink said, "It's got to go out or throw it away."  Ms. Blunt handed the toy wrench to Mr. Berman, who observed that it weighed about an ounce, slightly more than a first class envelope, and he turned to Deputy Sink and asked her if it was contraband.  And she said to throw it away, that it's got to go out.  Mr. Berman said "It's plastic, is this contraband?"  Deputy Sink said, "Throw it away. Get rid of it."

94.     Mr. Berman intended to give the plastic wrench to Ms. Blunt so she could take it back to his office or put it in the car, because that's what he does when a client has something

1  that is not allowed in the courthouse.

2  95.    Deputy Sink confronted Mr. Berman before he could tell Ms. Blunt to leave and

3  before he could give her the wrench and tell her to take it back.

4  96.    Deputy Sink suddenly grabbed at the toy and said, "Give it to me.  Give it to me."

5  Mr. Berman said, "Wait a second.  Hold on just a second."   He was just trying to talk to Deputy

6  Sink.  She grabbed him by the arm.  He had not taken any aggressive action toward her by body

7  language or by anything that he said.  As soon as she grabbed him, he exclaimed, "Please don't

8  hurt my back. Please don't hurt my back.  I just had surgery.  I just had surgery.  I had spinal fusion.

9  Please don't do that."

10  97.    Notwithstanding Mr. Berman's clear statement regarding his disability, Deputy

11  Sink grabbed his arm and tried to put his arm behind him in a hammerlock.  She had both hands

12  in one arm.  In his other arm he had been carrying a file.  He had brought an expando file and he

13  is right handed so that's the arm in which he carried it.

14  98.    In no way did Mr. Berman ever fight with Deputy Sink.  She grabbed him, turned

15  him around and he just spun around, stepped back, spun around and they were face to face.

16  99.    Deputy Sink came at Mr. Berman again while he begged her not to hurt his back.

17  He had the file in one hand and the plastic wrench in the other down by his side.

18  100.    After Deputy Sink grabbed him, completely disregarding his condition and his

19  lack of aggressiveness, she wrestled him from that location.  He even tried to step back a couple

20  of times to avoid the violence.  She grabbed him, spun him around, wrestled him around,

21  violently threw him on the table, and then she said put your hands behind your back.

22  101.    On March 13, 2012 Mr. Berman had been off work for four months because he had

23  had serious and extensive back surgery and returned to work about a week before this incident.

24  102.    Lt. Reynolds confirmed that he had received emails on February 18, 2014 from

25  Judge Conklin, then presiding judge of the Superior Court, and Judge Hillary Chittick addressed

26  directly at Deputy Sink.  In that email to Lt. Reynolds of February 18, 2014, Judge Conklin

27  referred to comments received from jurors concerning treatment they had received upon entering

28  the building and contacting Sheriff's Department screening staff.  He noted that these comments

were not isolated.  In this case five of the twelve jurors in Judge Chittick's courtroom passed on negative comments concerning treatment they received from the Sheriff's Department including, specifically, the security guards being very rude, some treated jurors as if they were criminals by the way they were treated and spoken to.  Entry into the courthouse as a juror was horrible most of the time.  They were rude and treated jurors as if they were an inconvenience.  The female security officer for jurors and employees was often rude which did not seem appropriate.  Security check-in staff was not courteous at times.

103.   When asked about whether he was concerned about the statement that the jurors claimed that entry as a juror was horrible most of the time, Lt. Reynolds responded that "it is a very strong statement, but we're talking about jury members coming through a screening process day after day after day, and it's an inconvenience."

104.   When questioned about this, Lt. Reynolds says "What was so horrible?  The fact that they were subject to screening?"  Plaintiff's Counsel stated "I don't know."  Lt. Reynolds' responded "I don't know either."

105.   Lt. Reynolds determined there was no need to continue investigation because he did not believe there was any violation of government policy.

106.   Lt. Reynolds knew that he could find the names of jurors and question them as to why they gave this input to the Judge.

107.   Lt. Reynolds intentionally decided not to discuss the issue with the jurors because he did not believe is was necessary.

108.   Lt. Reynolds thought that even though he was concerned that the complaints were not specific enough, he did not feel called upon as part of his duties as a supervisor to inquire of the jurors more detailed information.

109.   However, Lt. Reynolds not only did not investigate these complaints, he did not even communicate to Deputy Sink that these complaints had been made about her, as he did not believe that it was necessary.  He did, however, remove her from the position of screening in February 2014 and said he would not allow her to return to that position.

110.   Lt. Reynolds acknowledged that he could not recall offhand receiving any emails

1   from the judges about any other person in the three years that he was in charge of court services.

2   111.   Deputy Sink did not return to screening as a primary assignment after February

3   18, 2014 or February 19, 2014.   As a training officer, she does train new deputies in that

4   position.

5   112.   Even though Lt. Reynolds removed Deputy Sink from her screening position, he

6   nonetheless permitted her to remain as a training officer.

7   113.   Lt. Reynolds concluded that he would not put her back as a screening person,

8   "Unless I felt like I wanted to hear these complaints again, I wouldn't."

9   114.   Indeed, Lt. Reynolds never even spoke to Deputy Sink about these complaints.

10   115.   Lt. Reynolds received a complaint from Judge Ellison on April 14, 2014, two

11   months after the juror complaints in February of 2014.

12   116.   Lt. Reynolds then got an email from Judge Ellison specifically complaining about

13   Deputy Sink that he had rude encounters with her.   The details are not important; he said they

14   were apparently consistent with her behavior when she was previously assigned to entry

15   screening.   "Perhaps you can find an assignment for her that does not involve interaction with

16   other human beings."

17   117.   Lt. Reynolds did not believe that Judge Ellison's email was specific enough.   He

18   had agreed to meet with Judge Ellison at a later time but did not.

19   118.   With regard to the statement that Judge Ellison made that "Perhaps you can find

20   an assignment for her that does not involve interaction with other human beings," Lt. Reynolds

21   did not consider that that statement required him to do additional investigation.

22   119.   Lt. Reynolds never discussed the complaint that he had received from Judge

23   Ellison with Deputy Sink.

24   120.   Lt. Reynolds never even discussed with Deputy Sink the fact that three judges had

25   made complaints about Deputy Sink's behavior.

26   121.   On March 13, 2012, Mr. Berman wrote a letter complaining of his unlawful arrest

27   and use of excessive force to the Fresno County Sheriff's Department requesting that all

28   evidence, including courthouse surveillance, be preserved.   The Sheriff's Department did not

1  conduct any investigation of Mr. Berman's complaints.   No one from the County sought to

2  interview Mr. Berman or Ms. Blunt about the incident.

3                                          **IV.**

4                                     **ANALYSIS**

5          The fifth claim for relief alleges that Fresno County had a custom, policy, or practice that

6  resulted in a failure to adequately train or supervise its court services division employees and/or

7  agents to prevent the constitutional violations suffered by Plaintiff.   Plaintiff alleges that the

8  misconduct is affirmatively linked to constitutional violations set forth in his first, second, and

9  third claims for relief, which are for the false arrest and unlawful detention of Plaintiff in

10 violation of the Fourth Amendment, the excessive and unreasonable force used against Plaintiff

11 in violation of the Fourth Amendment, and retaliation against Plaintiff for exercising his First

12 Amendment rights to dispute, question, challenge, and seek redress against government

13 authorities without reprisal.   Fresno County moves for summary judgment on Plaintiff's fifth

14 claim for relief for <u>Monell</u> claims asserted against Fresno County.   Fresno County asserts that the

15 Fresno County Sheriff's Department does not have a policy or practice which permits use of

16 excessive force or unlawful arrest and that Fresno County Sheriff's Department has an effective

17 policy and procedure to train and supervise its employees.

18       A.      **<u>Monell</u> Liability for Failure to Train and Supervise Deputies on Retaliation
                 for Exercising First Amendment Rights**
19

20         As noted, Defendant Fresno County moves for summary judgment on the fifth claim for

21 relief.   In his opposition, Plaintiff asserts that Fresno County did not seek summary judgment as

22 to the municipal liability claim for violation of Plaintiff's First Amendment rights.   Fresno

23 County counters that it did ask for summary judgment on the entire fifth cause of action.   Fresno

24 counter asserts that the fifth claim for relief does not contain specific facts regarding a violation

25 of the First or Fourth Amendment, but does acknowledge that the fifth claim for relief

26 incorporates the third claim for relief, in which Plaintiff alleges that exercising his First

27 Amendment right to question, challenge, and address authority subjected him to retaliation when

28 he was falsely arrested and subjected to excessive force.   Fresno County argues that it addressed

1   both the First and Fourth Amendment claims by addressing the policies and procedures,
2   including the training and supervision, for lawful arrest and use of force.

3          However, the Court finds that Fresno County did not address or reference the <u>Monell</u>
4   claim regarding retaliation for Plaintiff exercising his First Amendment rights in its motion for
5   summary judgment.  Fresno County did not reference in its summary judgment motion any
6   training or supervision with regard to retaliation for a person exercising his or her First
7   Amendment rights.  Fresno County has not sufficiently shown an absence of a genuine issue of
8   material fact for the <u>Monell</u> claim regarding retaliation for Plaintiff exercising his First
9   Amendment rights.  Fresno County has not met its initial responsibility in regard to the <u>Monell</u>
10  claim regarding retaliation for Plaintiff exercising his First Amendment rights.   Therefore,
11  summary judgment will be denied as to Plaintiff's <u>Monell</u> claim for a violation of Plaintiff's First
12  Amendment rights.  The remainder of this order only addresses whether summary judgment is
13  appropriate on the <u>Monell</u> claim for violation of Plaintiff's Fourth Amendment rights.

14         **B.      Legal Standard for <u>Monell</u> Claim**

15         A local government unit may not be held responsible for the acts of its employees under a
16  <u>respondeat</u> <u>superior</u> theory of liability.   <u>Monell v. Department of Social Services</u>, 436 U.S. 658,
17  691 (1978).  Rather, a local government unit may only be held liable if it inflicts the injury
18  complained of through a policy or custom.   <u>Waggy v. Spokane County Washington</u>, 594 F.3d
19  707, 713 (9th Cir. 2010).

20         Generally, to establish municipal liability, the plaintiff must show that a constitutional
21  right was violated, the municipality had a policy, that policy was deliberately indifferent to
22  plaintiff's constitutional rights, "and the policy was the moving force behind the constitutional
23  violation." <u>Burke v. County of Alameda</u>, 586 F.3d 725, 734 (9th Cir. 2009) (citation omitted);
24  <u>see</u> <u>also</u> <u>Gibson v. County of Washoe, Nev.</u>, 290 F.3d 1175, 1185-86 (9th Cir. 2002).

25         In the instant summary judgment motion, Fresno County does not challenge whether
26  Plaintiff's constitutional rights were violated.  Plaintiff must prove all of the elements of the
27  <u>Monell</u> claim, so if Plaintiff fails to meet his burden to show that a genuine issue of material fact
28  exists as to any element of the <u>Monell</u> claim, then summary judgment is appropriate.  In this

1  motion for summary judgment Fresno County does not challenge the element regarding whether

2  Plaintiff's constitutional rights were violated, therefore, the Court does not analyze this element.

3      **C.    County of Fresno's Policy Regarding Training and Supervision of Deputies**

4       "A municipality's failure to train an employee who has caused a constitutional violation

5  can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference

6  to the rights of persons with whom the employee comes into contact." Long v. County of Los

7  Angeles, 442 F.3d 1178, 1186 (9th Cir. 2006); see City of Canton, Ohio v. Harris, 489 U.S. 378,

8  388 (1989). "The issue is whether the training program is adequate and, if it is not, whether such

9  inadequate training can justifiably be said to represent municipal policy." Long, 442 F.3d at

10  1186, see Canton, 489 U.S. at 390. The failure to train must be the moving force behind the

11  constitutional violation. Id. at 391.

12       A municipality may be held liable by showing 1) a practice or custom which constitutes a

13  standard operating procedure of the entity; 2) "by showing that the decision-making official was,

14  as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to

15  represent official policy in the area of decision," or 3) "by showing that an official with final

16  policymaking authority either delegated that authority to, or ratified the decision of, a

17  subordinate." Ulrich v. City and County of San Francisco, 308 F.3d 968, 984-85 (9th Cir. 2002)

18  (internal punctuation and citations omitted). "A custom can be shown or a policy can be inferred

19  from widespread practices or evidence of repeated constitutional violations for which the errant

20  municipal officers were not discharged or reprimanded." Pierce v. County of Orange, 526 F.3d

21  1190, 1211 (9th Cir. 2008) (internal punctuation omitted). "Liability for improper custom may

22  not be predicated on isolated or sporadic incidents and that [t]he custom must be so persistent

23  and widespread that it constitutes a permanent and well settled city policy." Hunter v. County of

24  Sacramento, 652 F.3d 1225, 1233 (9th Cir. 2011) (quoting Trevino v. Gates, 99 F.3d 911, 918

25  (9th Cir.1996) (quoting Monell, 436 U.S. at 691)) (internal quotation marks omitted).

26       Under Federal Rule of Civil Procedure 56, Defendant Fresno County has the initial

27  burden of setting forth its bases for its motion and identifying those portions of "the pleadings,

28  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, which it believe[d] demonstrate the absence of a genuine issue of material fact." Celotex
Corp., 477 U.S. at 322.  Here, Fresno County argues that the evidence is clear that Fresno
County Sheriff's Department had a detailed and stringent training policy and procedure for its
deputies regarding the proper use of force and arrest that complied with POST standards and that
Deputy Sink was up to date on her training requirements at the time of the incident.  Fresno
County asserts that it has never had a policy or custom of allowing its personnel to use excessive
force and commit false arrests.  Fresno County also argues that there is no evidence that there
was any failure to supervise the deputies, including Deputy Sink, that amounted to deliberate
indifference or that any inadequacy in supervision could have resulted in the subject incident.

The Court finds that Fresno County has met its initial burden that the Fresno County
Sheriff's Department did not have a policy that was indifferent to Fourth Amendment rights
regarding excessive force, unlawfully detaining, and false arrest.

Once the moving party meets its initial burden, the burden shifts to the party opposing the
summary judgment motion to establish that a genuine issue as to any material fact actually does
exist. Matsushita Elec. Indus. Co., 475 U.S. at 586.  Plaintiff alleges that Fresno County failed to
train Defendant Sink on the use of force and lawful arrest.  Plaintiff also alleges that Fresno
County has adopted an unconstitutional custom or practice because it fails to supervise,
investigate, and discipline employees for constitutional violations, as evidenced by how Fresno
County handled the pre-incident complaints and post-incident complaints against Deputy Sink.

1.    Deputy Sink's Training

Plaintiff has failed to show that Fresno County failed to train Sheriff's Department
deputies on the proper procedure for lawful arrest and the use of force.  Fresno County argues
that the Sheriff's Department had a very detailed and stringent training policy and procedure for
its deputies which complied with POST standards.  (UF21.)  While Plaintiff alleges that Fresno
County failed to train Defendant Sink on the use of force and lawful arrest, Defendant Sink had
attended a POST certified police academy and received basic POST certification.  (UF34; Gilbert
Decl. ¶¶ 2, 4.)  In Ryan Gilbert's declaration, he states that "[a]t the time of the incident that is
the subject of this lawsuit, it was the policy of the Fresno Sheriff's Department to comply with

17

1  the minimum training requirements for peace officers in the State of California as mandated by

2  POST." (Gilbert Decl. ¶ 2.)  Also, Mr. Gilbert states:

> In 2007 when Tracy Sink was hired, deputies underwent a 14 to 16 week field training program.  The new deputies were placed with three different experienced training officers during this program. Deputies were instructed on a number of topics, including, but not limited to the policies and procedures of the Fresno Sheriff's Department and relevant standards concerning use of force and lawful arrest.  Deputies were evaluated on a daily basis during the field training program.

(Gilbert Decl. ¶ 4.)

Therefore, Fresno County has presented evidence that Fresno County Sheriff's Department's training was in compliance with POST and that Deputy Sink was up to date on her training requirements.   Plaintiff offers no evidence to the contrary to refute the evidence presented by Fresno County.  Matsushita, 475 U.S. at 586 n.11.  Plaintiff has not shown that there is a material dispute of fact regarding the Fresno County Sheriff's Department having a custom or policy that was indifferent to constitutional rights that resulted in a failure to adequately train.

2.    Supervision, Investigation, and Discipline of Employees

Plaintiff argues that Fresno County has adopted an unconstitutional custom or practice as shown by its failure to supervise, investigate, and discipline employees for widespread constitutional violations.  A custom or practice can be "inferred from widespread practices or 'evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.' "  Hunter, 652 F.3d at 1233-34 (quoting Nadell v. Las Vegas Metro. Police Dep't, 268 F.3d 924, 929 (9th Cir.2001) (quoting Gillette v. Delmore, 979 F.2d 1342, 1349 (9th Cir.1992), abrogated on other grounds as recognized in Beck v. City of Upland, 527 F.3d 853, 862 n. 8 (9th Cir.2008)).

At the time of the incident, Fresno County deputy sheriffs in the court security unit were supervised through a chain of command: sergeant, lieutenant, assistant sheriff and sheriff.  (UF 36.)  Deputies were supervised on a daily basis by sergeants, their immediate supervisors, and/or senior deputies.  (UF 37.)

Plaintiff argues that Fresno County did not adequately investigate Plaintiff's written complaint made to Sheriff Mims on March 13, 2012, even though Penal Code § 832.5 required Fresno County to do so.  Plaintiff also argues that Fresno County's failure to comply with Section 832.5 of the California Penal Code has resulted in him not knowing how many other members of the public complained to the County about Deputy Sink.  Fresno County argues that it is in compliance with Penal Code § 832.5 because Fresno Sheriff's Department has a citizen complaint procedure in place.  Penal Code section 832.5 provides in relevant part as follows:

> (a)(1) Each department or agency in this state that employs peace officers shall establish a procedure to investigate complaints by members of the public against the personnel of these departments or agencies, and shall make a written description of the procedure available to the public.

In Sheriff Mims's declaration, she states that the Fresno Sheriff's Department permits citizens to present citizen complaints to the Fresno County Sheriff's Department, which triggers an administrative investigation.  (UF 56; Mims Decl. ¶ 5.)  "Once it is determined that a complaint will result in an investigation, it is assigned either to an Internal Affairs investigator, or returned to the bureau of the deputy that is the subject of the complaint to conduct the investigation.  An investigation will then be conducted into whether there was a violation of any Sheriff's Department policies or law."  (Mims Decl. ¶ 6.)  The Fresno County Sheriff's Department has a written procedure for members of the public to file written citizen's complaints against peace officers.  The fact that Mr. Berman did not avail himself of this option does not impact whether Fresno County is in compliance with Penal Code § 832.5.

### a.   Pre-incident complaints

Prior to the incident at issue in this case, there were four to five oral complaints that Deputy Sink was rude.  (UF 76; Sgt. Bertsch Depo. 53:8-54:3).  Specifically, Sgt. George Bertsch's deposition testimony stated:

> Q: Okay, fair enough.  Now during the time that you were her supervisor, the ten months that you were her supervisor, did you ever get any complaints about her that - did any people ever complain that she was perceived as being loud and rude, ever?
> A: Yes.
> Q: Okay.  How many occasions did you get complaints about her?
> A: I couldn't give you an exact amount, but I would say less than

1    five.
     Q: More than four?
2    A: Four to five.
     Q: Four to five. I'm just asking - - -
3    A: I would - - I guess I would say four to five.
     Q: And that would be in ten months?
4    A: Yes.
     Q: Did you counsel her about that?
5    A: We discussed it.
     Q: How many times did you discuss it?
6    A: Every time.

7    (Sgt. Bertsch Depo. 53:8-54:3.)

8           Sgt. Bertsch testified that for the four or five complaints, he would go down and ask the

9    complainant what had occurred. After learning the circumstances that led to the complaint, he

10   would inform the complainants about the situation at the courthouse. (Sgt. Bertsch Depo. 54:15-

11   22.) Most complainants were upset because they were trying to bring something into the

12   courthouse that was not allowed. (UF 77; Sgt. Bertsch Depo. 54:22-24.) Sgt. Bertsch talked to

13   Deputy Sink after each verbal complaint and explained that "Hey, you know, maybe you need to

14   be, you now –I don't want to say—a little nicer; let me put it that way." Sgt. Bertsch testified

15   that rude was not acceptable to him. (UF 80; Bertsch Depo. 55:10-11.) Sgt. Bertsch completed

16   Deputy Sink's evaluations, but he did not include these four to five verbal complaints because he

17   did not think it was a problem that needed to be addressed because she had 4 or 5 complaints

18   over a 10 month span and there were between 1,000 and 3,000 people a day in the courthouse.

19   (UF 79; Bertsch Depo. 56:5-24.)

20          Therefore, there is evidence in the record that Deputy Sink's supervisor, Sgt. Bertsch, did

21   speak to her after each of the pre-incident verbal complaints. Plaintiff has not presented any

22   evidence to contradict this. Furthermore, Sgt. Bertsch explained his decision not to include these

23   four or five pre-incident complaints in Deputy Sink's evaluations because of the small number of

24   complaints compared to the large number of people that she interacted with over that ten month

25   period. Therefore, the Court finds that the pre-incident complaints do not support Plaintiff's

26   claim that Fresno County failed to adequately investigate, discipline, or supervise employees.

27          **b.      Post-incident complaints**

28          Plaintiff also points to post-incident evidence. See Henry v. Cnty. of Shasta, 132 F.3d

1   512, 519 (9th Cir. 1997), <u>amended on denial of rehearing</u>, 132 F.3d 512 (9th Cir. 1997) ("[P]ost-

2   event evidence is not only admissible for purposes of proving the existence of a municipal

3   defendant's policy or custom, but is highly probative with respect to that inquiry.").   Plaintiff

4   argues that a jury could find that the inaction of Deputy Sink's supervisors and the Sheriff's

5   Department to the complaints against her manifest a policy or practice of deliberate indifference

6   to the constitutional rights of the public, including Plaintiff.

7        Plaintiff alleges that the three post-incident complaints from judges about Deputy Sink

8   resulted in no discipline or real training and that Deputy Sink was not even told about the

9   incidents.  The incident occurred between Deputy Sink and Plaintiff on March 13, 2012.  (UF 4-

10   20; UF 88-100.)   The post-incident complaints occurred approximately two years after the

11   incident. (UF 102.)  Although Plaintiff claims that Deputy Sink was not told about the incidents,

12   it is clear from a review of the deposition transcripts that Sgt. Lopez informed her about the

13   February 2014 juror complaints.  Sgt. Lopez was Deputy Sink's sergeant from September 2012

14   until February 2014.  (Lopez Depo. 5:22-8:6.)

15        On February 18, 2014, Judge Conklin contacted Lt. Reynolds to discuss comments made

16   by the jurors in Judge Chittick's court.  (Reynolds Depo. 30:8-31:12.)  On February 19, 2014,

17   Judge Chittick forwarded the comments from the jurors to Lt. Reynolds.  These two emails by

18   Judge Conklin and Judge Chittick refer to the same incident.  Lt. Reynolds testified during his

19   deposition that there were no comments in Judge Conklin's email about what Deputy Sink did

20   that was rude except that she treated the jurors as if they were an inconvenience.  (Reynolds

21   Depo. 32:10-25.)   Lt. Reynolds based his decision that there was no violation of department

22   policy on the email conversations and a follow-up conversation that he had with Judge Chittick.

23   (UF 105; Reynolds Depo. 34:2-35:4.)

24        Sgt. Lopez testified that Lt. Reynolds told him about the complaints from the jurors,

25   specifically from Judge Chittick's courtroom.  (Lopez Depo. 37:20-38:4.)  Sgt. Lopez testified

26   that these complaints were directed at the whole lobby team as well as a specific comment about

27   Deputy Sink and that these comments concerned him.  (Lopez Depo. 38:17-39:17.)   After

28   learning of the complaints, Sgt. Lopez contacted his lead deputy at the time, Deputy Horne.

1  (Lopez Depo. 40:2-12.)  Deputy Horne spoke with the clerk of court and the judge to try to get

2  specifics, but he reported to Sgt. Lopez that the complaints were in generalities.  (Lopez Depo.

3  40:14-17.)  The complaints were notes that were written by jurors at the end of their jury service,

4  but the jurors were gone by the time that the officers went to follow up.  (Lopez Depo. 40:17-

5  24.)

6        Sgt. Lopez testified that he did ask Deputy Sink if she recalled anything happening that

7  would be deemed rude, but she did not recall any particular incident.  (Lopez Depo. 42:13-17.)

8  In response to the emails, Sgt. Lopez spoke to the lobby team and reminded everyone to be

9  professional and to be cognizant of how they say things and what they say.  (Lopez Depo. 43:19-

10  44:2.)  Sgt. Lopez also told the lobby team that he wanted to know about anything that he needed

11  to know about on the day of and not at a later date, so that he could take steps to look into it.

12  (Lopez Depo. 44:2-6.)

13        On April 15, 2014, Judge Ellison complained about Deputy Sink's behavior to Lt.

14  Reynolds.  (UF 115-116; Reynolds Depo. 38:7-11.)  Lt. Reynolds testified that he and Judge

15  Ellison agreed to meet at a later time to discuss it, but that time never came.  (Reynolds Depo.

16  39:21-40:1.)  Lt. Reynolds testified that he is sure that he advised Deputy Sink's sergeant of the

17  complaints.  (Reynolds Depo. 43:6-10.)  Although this complaint may not have been conveyed to

18  Deputy Sink, this one incident is not enough to show that the department had a policy of not

19  investigating complaints and supervising the deputies.  See Trevino, 99 F.3d at 918.

20        There was one citizen's complaint made against Deputy Sink in December 2012 that was

21  referred to Internal Affairs.  (UF 83-84.)   As discussed above, Fresno County Sheriff's

22  Department has procedures for the filing and investigation of citizen's complaints.  Internal

23  Affairs returned the investigation of the December 2012 citizen complaint to the bureau, so it

24  was sent back to the bureau from which it originated and Sgt. Lopez conducted that

25  investigation.  (Lopez Depo. 47:12-48:10.)  Sgt. Lopez interviewed the complainant and the

26  complainant stated that Deputy Sink's tone was not called for and was rude and bitchy.  (Lopez

27  Depo.  48:11-49:8.)  After speaking to the complainant, Sgt. Lopez spoke to Deputy Sink, but

28  she did not recall the incident.  (Lopez Depo. 49:13-18.)  The complaint was not sustained.  (UF

1  86.)

2      Therefore, there is evidence in the record that Deputy Sink's supervisor, Sgt. Lopez,

3  spoke to her about the post-incident jury complaints.  There is also evidence that the December

4  2012 citizen's complaint against Deputy Sink was investigated according to Fresno County

5  Sheriff's Department procedures.  Although Deputy Sink was not told about Judge Ellison's

6  complaint and Lt. Reynolds did not conduct further follow-up on this compliant with Judge

7  Ellison, one incident is not sufficient to show that the department had a policy of not

8  investigating complaints and supervising the deputies.  See Trevino, 99 F.3d at 918.  Plaintiff has

9  not presented any evidence to contradict this.  Therefore, the Court finds that the post-incident

10  complaints do not support Plaintiff's claim that Fresno County failed to adequately investigate,

11  discipline, or supervise employees.

12      3.    Plaintiff Has Not Established a Genuine Dispute of Material Fact

13      As discussed above, once Fresno County met its initial burden, the burden shifted to the

14  Plaintiff to establish that a genuine issue as to any material fact actually does exist.  See

15  Matsushita Elec. Indus. Co., 475 U.S. at 586.  Plaintiff has not provided any evidence that the

16  Fresno County Sheriff's Department had a custom or policy that was indifferent to Fourth

17  Amendment rights' not to be subject to excessive and unreasonable force, not to be unlawfully

18  detained without a reasonable basis, and not to be falsely arrested without probable cause.

19  Accordingly, Plaintiff has failed to meet his burden to demonstrate that a genuine issue of

20  material fact exists as to the Monell claim regarding excessive force, unlawful arrest, and

21  unlawful detaining in violation of the Fourth Amendment.  Since Plaintiff has failed to establish

22  this element of his Fourth Amendment Monell claims, Fresno County is entitled to partial

23  summary judgment on the Monell liability claim (fifth claim) regarding excessive force,

24  unlawful arrest, and unlawful detaining in violation of the Fourth Amendment.

25                **V.**

26               **ORDER**

27      Based on the foregoing, IT IS HEREBY ORDERED that:

28      1.    Defendant Fresno County's motion for summary judgment is GRANTED

IN PART as follows:

    a.      Summary judgment is granted on the fifth claim for relief for municipal liability regarding excessive force and unlawful arrest claims in violation of the Fourth Amendment;

    b.      Summary judgment is denied on the fifth claim for municipal liability regarding retaliation for exercising his First Amendment right to question, challenge, and address authority.

    2.      The fifth claim for relief is proceeding only on the municipal liability claim regarding retaliation for exercising his First Amendment right to question, challenge, and address authority.

IT IS SO ORDERED.

Dated:   **May 2, 2016**

_____
UNITED STATES MAGISTRATE JUDGE